UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, ex rel. David V. McIntosh, <br><br> Plaintiffs, <br><br> v. <br><br> M.K. Battery, Inc., East Penn Manufacturing Co, Inc., N.P.C. Robotics, Inc., and BAE Systems, Inc., <br><br> Defendants. | Case Type: False Claims Act <br> Court File No.: Civ. 08-SC-6471 DWF/JJK <br><br><br> (Filed <u>In Camera</u> and <u>Under Seal</u>) |

**AMENDED COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT**
**JURY TRIAL DEMAND**

Qui Tam Plaintiff David V. McIntosh, by and through his attorneys, brings this Complaint on behalf of the United States pursuant to 31 U.S.C. § 3730 and on his own behalf as follows:

### I. INTRODUCTION

1.      This is an action for damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729, *et. seq.* and under Minn. Stat. § 181.932, the Minnesota Whistleblower Statute. This case involves the sale by Defendants of non-conforming batteries to the military for use in combat vehicles deployed in Iraq and the submission of claims for payment for those batteries. In essence, Defendants gave the military sample batteries to test for use in the gun turrets of Humvees deployed in Iraq. Once these batteries were tested in Arizona by Armor Holdings and approved for this use, Defendants knowingly changed the design and method of manufacture of the batteries in order to reduce cost. These changes affected critical performance attributes of the batteries. The military approved and agreed to purchase batteries identical to the samples that it tested, batteries that were manufactured and tested in a certain manner;



Defendants supplied them with batteries made and tested in a different manner and with a different performance capability than the sample batteries initially supplied. Plaintiff McIntosh repeatedly demanded that his employer, M.K. Battery, and its customers East Penn and N.P.C. Robotics, inform the military of the change to the batteries. M.K. Battery refused to do so, instead actively concealing the batteries' nonconformity and warning McIntosh that he would be terminated if he persisted in raising this issue. Eventually, Plaintiff McIntosh reported the fraud to the United States Department of Defense contractor fraud hotline. McIntosh was fired because he reported in good faith to M.K. Battery, East Penn, and N.P.C. Robotics that they were violating federal law, and because his employer learned directly or indirectly that he had contacted the Department of Defense with this report from N.P.C. Robotics. After his termination, McIntosh further reported the fraud to Armor Holdings (now BAE Systems, Inc.)

2. This Court has both subject matter jurisdiction pursuant to 28 U.S.C. § 3145, 31 U.S.C. § 3730(b), and § 3730(h), and personal jurisdiction over the Defendants who are sued in their corporate capacity pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. § 3729 occurred in whole or in part in this district and the Defendants conduct business within the jurisdiction.

3. The Court has pendent jurisdiction over the state law claim (violation of Minn. Stat. § 181.932) against M.K. Battery.

4. Venue is proper in this district under 31 U.S.C. § 3732(a) because one or more of the Defendants either reside in this district or transact business within the district, and the acts proscribed by 31 U.S.C. § 3729 occurred in whole or in part in this district.

## II. PARTIES

5. Qui Tam Plaintiff David V. McIntosh ("McIntosh") was, until the date of his retaliatory discharge from employment on June 13, 2007, employed by M.K. Battery, Inc.

("M.K. Battery") in the State of Minnesota as a Regional Sales Representative. McIntosh is the original source of the allegations stated herein.

6.  Defendant M.K. Battery is a California corporation with its principal place of business at 1645 South Sinclair Street, Anaheim, California 92806, and is a wholly-owned subsidiary of Defendant East Penn Manufacturing Co., Inc. M.K. Battery claims to be the largest distributor of sealed lead acid batteries in North America.

7.  Defendant East Penn Manufacturing Co., Inc. ("East Penn") is a Pennsylvania corporation with its principal place of business in Lyon Station, Pennsylvania. East Penn claims to be the world's largest independent battery manufacturer. East Penn provides precision built Deka brand military/ordnance batteries for sale to the military.

8.  Defendant N.P.C. Robotics, Inc. ("N.P.C.") is a Minnesota corporation with its principal place of business in Mound, Minnesota. N.P.C. is primarily in the business of repairing drive motors used in wheelchairs.

9.  Defendant BAE Systems, Inc. ("BAE) is based in Arlington, Virginia and is the U.S. subsidiary of BAE Systems plc, which describes itself as a global defense, aerospace and security company. BAE's Land & Armaments sector provides, among other things, products and services in support of armored combat and tactical vehicles and artillery systems. BAE purchased Armor Holdings Inc. ("Armor Holdings") on July 31, 2007. At the time of the purchase, Armor Holdings sold, among other things, armor for Humvees. (Defendant BAE will be referenced as Armor Holdings in connection with events prior to July 31, 2007, but BAE is the Defendant for purpose of liability.)

### III. BACKGROUND

10.  This case involves the sale of batteries to the United States Department of Defense ("DOD") for use by the military in combat situations. Specifically, the batteries at issue

were manufactured by East Penn and sold through its subsidiary, M.K. Battery, to N.P.C. N.P.C. sold the batteries to Armor Holdings, which had a contract with DOD. The batteries were component parts used in gun turrets in vehicles supplied by Armor Holdings to DOD. Defendants sold the batteries to Armor Holdings knowing that they would be used in these applications and knowing that they would receive federal funds in payment for those batteries.

11. This case involves sealed lead acid batteries. From the perspective of how such a battery performs, there are basically two relevant types of batteries. The first is called a deep-cycling battery. A deep-cycling battery utilizes a small amount of energy that is drained out of the battery over an extended period of use. The other type of battery is a called a starting battery in which the battery is subjected to a high power drain which occurs over a very short period of time. Such a use, for example, is made when a car battery is used for starting a car engine. This case involves a deep-cycle battery application, because the batteries were to be used when a Humvee's diesel motor was incapacitated and the soldiers would depend on the batteries to power the gun turrets while awaiting rescue.

12. The performance capability of a sealed lead acid battery is determined by its plates and how they are fabricated. The plates in a battery are lead sulfate tabs that are arrayed in a grid pattern, which is then coated with a lead oxide paste. When treated with acid these plates become capable of storing the power that is used when the battery is drawn upon. There are two methods of fabricating the plates in a sealed lead acid battery. One method is that the plates, arrayed on their grid, are dipped in vats of acid. In this process the plates receive a uniform and thorough application of acid to their surface. This method of fabrication is called a plate-formed or tank-dipped method of manufacture. The plate grids are then incorporated into the battery.

13. The other fabrication process is called a "one-shot" or "whole battery" method. In this process the battery is first built into its housing. Once built, acid is poured into the battery. Though this fabrication process is cheaper and more efficient it results in a less thorough and uniform application of the acid to the plates.

14. Also, an "absorbed electrolyte" battery contains an amount of liquid electrolyte added at the factory that soaks into the special separators. Therefore, it is non-spillable because all of the liquid electrolyte is trapped in the sponge-like separator material. There is no "free" electrolyte to spill if tipped or punctured.

15. McIntosh was a Regional Sales Representative for M.K. Battery from February 28, 2001 to June 13, 2007. Prior to being terminated from his employment, McIntosh received uniformly positive performance evaluations. During his employment, McIntosh was offered two promotions to national sales positions within M.K. Battery, both of which he declined. As Regional Sales Representative, McIntosh sold batteries to N.P.C. for use in some of their "BattleBot" products. In 2005, N.P.C. was contacted by Armor Holdings because Armor had received information regarding N.P.C.'s wheelchair drive systems. Armor Holdings contacted N.P.C. as a potential supplier of drive systems for use in gun turrets of military Humvees. N.P.C. in turn contacted M.K. Battery to source the batteries necessary for this application. McIntosh became involved in supplying batteries to N.P.C. for testing in this application.

16. On April 5, 2005, McIntosh requested information on M.K. Battery No. SVR34-78DT ("78DT") (which number corresponds to East Penn Battery No. 9A78DT). In an e-mail to Mr. David Brunelle, McIntosh's supervisor, McIntosh requested information on the battery to determine if it would "perform in an environment that would have a 24 volt system that would be recharged at a continuous 28.0 volts":

> This is for the turret system for the Humvee, they would be of course, in Iraq, in confirmed cases that do not get ventilation though very hot environment. The batteries would get voltage when needed and would be typically ran to about 25 to 50% capacity and then recharged off the alternator of the Humvee. I would think the AGM product would be best suited for some reasons though the gel may be used if the voltage is consistent and <u>this is application for deep cycle use not starting</u>.

17. On or about May 26, 2005, McIntosh ordered four 78DT batteries for initial testing from M.K. Battery's parent corporation, East Penn.

18. On or about June 13, 2005, East Penn shipped four 78DT batteries to McIntosh to supply to N.P.C. for testing and approval. Prior to shipping the four batteries to N.P.C., McIntosh performed tests on the batteries. When N.P.C. received the batteries, it also tested the batteries and found them acceptable for use in the Humvee application in Iraq. These batteries were a 15-plate design that were manufactured using a tank-dipped process rather than a one-shot method.

19. In the fall of 2005, McIntosh supplied 26 additional batteries to N.P.C. for shipping to Armor Holdings. These batteries were supplied to Armor Holdings for stateside testing and were in fact tested by Armor Holdings in Arizona. The batteries were found to be acceptable as a deep cycling battery. Shortly thereafter, McIntosh supplied an additional 40 batteries to N.P.C. These batteries were shipped to Iraq along with N.P.C.'s drive systems for "real world" testing in military applications in Iraq. McIntosh himself personally tested all 70 of the test batteries sent to N.P.C. for inclusion in their prototype drive systems.

20. On or about May 22, 2006, McIntosh placed the first order to East Penn for 2,050 batteries to be sold to N.P.C., per N.P.C. PO 2729 for approximate shipment dates of 200 by July 10, 2006, 800 on August 3, 2006, and 1,050 on August 25, 2006. When these batteries were delivered and McIntosh performed spot-tests on them he became concerned that changes may

have been made to the manufacturing process used to make the batteries. McIntosh then inquired as to any such changes. He contacted Mark Sherwood ("Sherwood") of East Penn.

21.  In an e-mail dated February 16, 2006, Sherwood confirmed that East Penn had made changes in the design and manufacture of the 78DT battery. Whereas previously the battery had been a 15-plate, tank-dipped (or plate-formed) battery, it now had been changed to a 16-plate, one-shot battery:

> [T]herefore, the battery the military is testing is not the battery that East Penn will be building. I wanted to make sure you were aware of this change. I don't know how this will impact this potential business. Please let me know if you need anything from me.

22.  In response to this e-mail, McIntosh wrote to his supervisor, David Brunelle, as follows:

> Would you be able to ask why the changes were made and how they improved on the battery? This would be a good to know to convince the battery is better than it was. Though I have to say that it would have been nice to know the changes when they happened, and now that we have gone past the point of no return there really is little chance the battery can be accepted with the alterations.

23.  Thus, in the interim between the time McIntosh supplied sample batteries to N.P.C. and the time N.P.C. agreed to purchase those batteries, East Penn had in fact changed its manufacturing process, which change altered the performance characteristics of the 78DT batteries. East Penn had made that change because it was pursuing a large account with Sears to supply its "Die Hard" batteries. In order to win that account, East Penn had to enhance the starting battery performance characteristics of the 78DT. These changes, while enhancing the starting capabilities of the battery, diminished the 78DT's ability to function as a true deep-cycling battery.

24.  The sample batteries that the military had tested and accepted were different than the batteries that were ultimately supplied pursuant to Armor Holdings' contract. Moreover,

unaware of the change, neither Armor Holdings nor the military conducted tests on the changed batteries. Instead, East Penn supplied the batteries to M.K. Battery, which then sold them to N.P.C. as if they were the same batteries that had been tested and approved by Armor Holdings and the military for use in the Humvee gun turrets in Iraq. N.P.C. in turn supplied the batteries to Armor Holdings, again as if they were the same batteries that Armor Holdings and the military had tested and approved. Upon information and belief, Armor Holdings then certified the batteries to the military as being in compliance with contract specifications and requirements.

25. On or about May 25, 2006, McIntosh received the following communication from Barry Shellenhamer ("Shellenhamer"), Vice President of Product Development at East Penn:

> Hi Dave. I checked with Fred Silsdorf, our operations manager, who is very familiar with military contract. Your customer needs to let us know what they want the 9A78 to conform to. In other words, the military tells us the ratings, construction, etc. they want for a battery and we must certify that we are building the battery to conform to their specifications. Since the military has no specifications for the 9A78 they must tell us what specifications they want us to conform too. East Penn specifications? Give me a call if this does not make sense.

26. In response, McIntosh wrote:

> I believe they want to know the process and materials they are using and list those items, so they are not changed in the future and both sides can verify the product if need be....this would be a good starting point, and we could see if more info is needed from here.

27. On June 2, 2006, McIntosh informed Shellenhamer that he would "need some kind of document very soon that shows East Penn's compliance to build exactly what we supplied consistently."

28. On or about June 12, 2006, East Penn provided a certification to N.P.C. that the battery "conforms to the specifications published by East Penn Manufacturing Co., Inc. on June 1, 2006." The certification however, did not indicate the changes in the manufacturing

process or otherwise describe the change in the battery between what had been originally tested, approved, and supplied as samples, and what was then being manufactured and supplied.

29. In supplying this specification, Shellenhamer wrote:

Hi Dave [McIntosh]. I wanted to get this to you before you went out of town. Attached is the letter of conformance that we would want to use. *We only want the letter to state that the batteries that you are supplying conform to our specifications.* Who should the letter be addressed to?

East Penn's certification deliberately concealed from N.P.C. that the battery had been changed in its design, manufacturing process, and performance characteristics.

30. On or about September 24, 2006, Brunelle called McIntosh and the two discussed the details of this project and the value that it had to M.K. Battery. Brunelle informed McIntosh that it would be "very unwise for McIntosh to release information to anyone at this point regardless of his concerns or obligations and that any action contrary to this directive would be grounds for dismissal of McIntosh," or words to that effect.

31. Two days later, on or about September 26, 2006, McIntosh again exchanged e-mail correspondence with Brunelle. In his e-mail, McIntosh listed concerns regarding changes made to the battery and stated that the battery was not to be changed. In response, Brunelle stated that he had confidence in Shellenhamer and East Penn's reputation and prohibited McIntosh from giving notice of the change to N.P.C.

32. On October 2, 2006, Brunelle wrote to McIntosh stating that:

Does anyone have access to the required battery specifications for gun turret application with military project? It would be helpful to get information on the application, i.e. discharge requirements, run times, and cycle life or if specific testing should be done of the current design to ensure it meets military expectations.

33. In response to this e-mail, McIntosh wrote:

9

David I can try again to get some of the testing data though it is not likely. I do have some concerns that it may bring on suspicion to keep asking for this criteria. Do you agree?

34.     On or about October 5, 2006, McIntosh wrote to Shellenhamer of East Penn stating:

I know we talked about this a little in the past, although the new 9A78 is now meeting or exceeding the specifications that it was rated to in the past, there is some sensitivity about the performance of the battery and has been described as being more of an automotive battery. Of course, with the specific applications that we have put this battery into, I need to confirm that the new battery is typical as you stated to an AGM deep cycle. At 100% depth of discharge it would be characteristic that this new battery be able to perform to 200 cycles at this rate, per the printed literature that would be on track with other AGM deep cycle products.

Please let me know if this is truly the case with this product being there is still some apprehension on how this product is to perform and specific applications.

35.     Hearing no response, McIntosh again wrote to Shellenhamer on October 9, 2006 laying out the specification of the testing he had performed on the 9A78 which showed that the test results "are not encouraging."

36.     McIntosh tested the batteries and discovered that they did not comply with the expectations and requirements originally set by N.P.C. for Armor Holdings when compared to the original tested and approved batteries. The new batteries' ability to hold a charge as it is drained is an important, indeed critical, feature in this application because the Humvee batteries in the field will only be put to critical measure if the engine, which would ordinarily re-charge the battery, is rendered incapacitated. Therefore, the battery must be able to be used in a deep-cycle application when the battery is subjected to a slow, steady drain rather than a large, one-time drain of power and repeatedly maintain its ability to re-charge over an extended period of use.

37. As a result of his personal testing of the batteries McIntosh discovered that the batteries did not perform as the original sample batteries had performed and as expected by the military, and did not have sufficient depth of discharge. As the batteries were repeatedly drained, recharged and drained again, they did not hold a full charge for nearly as long as they did when they were new. Based upon his testing of the batteries, McIntosh realized that the batteries would not be fit for use in military Humvees, particularly those in combat situations when the batteries would be tested to their ultimate strength.

38. On or about November 21, 2006, McIntosh performed tests comparing the old battery design and manufacture against the substituted battery design and manufacture. These test results indicated that the new battery as manufactured was not appropriate for a deep-cycling application.

39. On or about November 22, 2006, Brunelle forwarded to McIntosh questions that were raised by East Penn regarding the N.P.C. 9A78 application. These questions, among others, asked what tests the batteries had been subjected to by the military, what the life expectancy was, what was the cycle life expected by the military and whether or not East Penn needed to requalify the new batteries.

40. On or about December 6, 2006, a teleconference was held between Mr. Norman Domholt ("Domholt"), President of N.P.C., Brunelle, and McIntosh. The purpose of the call was to answer questions posed by East Penn regarding the application used by the 9A78DT. East Penn had posed the questions because it was concerned that the substituted batteries might not perform properly as compared to the original batteries that had been tested and approved by the military. At no time during the telephone conference did Brunelle inform Domholt that the batteries no longer conformed to the sample that N.P.C. had tested prior to entering into the

contract. After the telephone conference, Brunelle informed McIntosh that he, Brunelle, was "confident of the battery working though it should not be a big deal anyway. Even if the battery is not a cycling battery anymore the troops are only going to have one chance to use it anyway before they get blown up."

41. On January 25, 2007, McIntosh expressed concern to Brunelle that Brunelle still had not told N.P.C. of the changes that had been made to the battery on February 16, 2006. In response, Brunelle again prohibited McIntosh from divulging the information regarding battery changes to N.P.C. During this conversation, Brunelle stated to McIntosh "Mr. McIntosh, Mr. Wels [Mark Wels ("Wels")], President of M.K. Battery] and I are very aware of this problem and are in control of it. It would be unwise if you take this on yourself," or words to that effect. That same day, McIntosh had a second conversation with Brunelle again warning the project was scaring him and that there were serious issues with not disclosing the changes to N.P.C. Again he was instructed to mind his own business.

42. Over the next few weeks, McIntosh continued to raise the issue of the nonconforming substitute batteries and the need to disclose changes in the battery construction to N.P.C. A series of discussions and internal meetings ensued based on McIntosh's allegations of under-performance resulting from the change to the plating methodology.

43. On or about March 7, 2007, McIntosh telephoned Norman Domholt ("Domholt"), President of N.P.C., and Richard Reid, the N.P.C. General Manager, and informed them of the problem with the batteries. When McIntosh informed Domholt of the problem, Domholt commented that "I'm going to lose my business; I'm going to get sued." During this discussion, McIntosh told Domholt that Brunelle and Wels had told McIntosh not to inform N.P.C. upon penalty of losing his job. Norm Domholt did not contact Wels or Brunelle and told McIntosh

that he wanted to wait until a scheduled East Penn tour at Lyon Station, Pennsylvania, where Domholt would raise the battery change questions to all the principals at East Penn at that time.

44.     The tour was scheduled for April 9, 2007. The tour was canceled by Domholt due to scheduling conflicts and was never rescheduled.

45.     Information supporting the non disclosure of the battery change was supplied to Domholt by McIntosh on March 9, 2007 in person. Domholt told McIntosh that he did not want any copies of e-mails or documents sent to him until he had time to think of what he was going to do.

46.     On April 10, 2007 McIntosh used certified mail to send all supporting documentation to Domholt for verification per his direction. On April 24, 2007, while traveling to Kansas City on business, and fully knowing that Wels and Brunelle would never disclose the changes to the battery, McIntosh called Delight Breidegam, Chairman and Co-founder of East Penn to inform him of the wrongdoing by Wels and Brunelle. Breidegam was upset to hear of this circumstance and made a derogatory comment regarding Brunelle. Breidegam then told Daniel Langdon ("Langdon"), the President of East Penn, of the wrongdoing of Brunelle and Wels, as conveyed by McIntosh. Langdon, in turn, telephoned Mark Wels, the M.K. Battery President.

47.     On or about April 24, 2007, McIntosh received a call from Mark Wels. Wels, furious, demanded to know why McIntosh had called Breidegam. Wels reprimanded McIntosh for going over his head and calling Breidegam.

48.     On April 26, 2007, a conference call was held between representatives of N.P.C., East Penn and M.K. Battery, including Rick Reid, Mark Sherwood, Mark Wels, Norm Domholt, Dave Brunelle, Davis Knowes and others. A digital tape was made of the call, during which East

Penn and M.K. Battery admitted to N.P.C. that they had changed the process for manufacturing the batteries.

49. Dan Langdon then contacted McIntosh on April 27, 2007 and went to great detail in trying to dismiss the actions of Wels and Brunelle, and tried to assure McIntosh that he was getting to the bottom of the problem.

50. Two days after the April 27 telephone call, Domholt telephoned McIntosh and told him that N.P.C. would continue to use the batteries. McIntosh told Heather Scanlon, M.K. Battery's Controller, and Norm Domholt of N.P.C. Robotics that, if the Defendants did not contact the Department of Defense, he would. Upon learning of N.P.C.'s decision to bury the results of McIntosh's testing, McIntosh telephoned the DOD on May 24, 2007 and informed the DOD of the details of the undisclosed changes to the batteries and of the failure of the batteries to perform as expected.

51. McIntosh was terminated from his employment with M.K. Battery on June 13, 2007.

52. At the end of June, 2007, McIntosh contacted George Stringer who was Armor Holdings' Vice President of Programs-Ground Vehicles Survivability Division. McIntosh informed Stringer of the details of the undisclosed changes to the batteries, the failure of the batteries to perform as expected, and the undisclosed substitution of a different battery than the battery initially tested, approved, and ordered. Stringer joined BAE when it purchased Armor Holdings at the end of July 2007. On information and belief, Stringer continued working in a similar position at BAE. Stringer never contacted McIntosh for any additional information, although he took down McIntosh's contact information.

53. On information and belief, BAE continued to provide the contractually agreed-to gun turrets to the DOD using the batteries provided by Defendants East Penn, M.K. Battery and N.P.C., without informing the DOD of the undisclosed changes to the batteries, the failure of the batteries to perform as expected, and the undisclosed substitution of a different battery than the battery initially tested, approved, and ordered.

54. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, severe emotional distress, embarrassment, humiliation and loss of self esteem. Plaintiff was prevented, and will continue to be prevented, from performing his normal daily activities and obtaining the full enjoyment of life, has sustained loss of earnings and earning capacity, has incurred and/or will incur expenses for medical and psychological treatment, therapy and counseling, and has incurred and will continue to incur other related damages. Plaintiff has also incurred attorney's fees and expenses and other serious damages.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FOR VIOLATION OF FALSE CLAIMS ACT AGAINST ALL DEFENDANTS

55. Plaintiff realleges and incorporates by reference, as if fully set forth herein, paragraphs 1 through 51, inclusive.

56. By virtue of the acts described above, the Defendants, and each of them have knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act, as amended, 31 U.S.C. § 3729(a)(2).

57. Because of these acts the United States has suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## FOR VIOLATION OF FALSE CLAIMS ACT AGAINST ALL DEFENDANTS

58. Plaintiff realleges and incorporates by reference, as if fully set forth herein, paragraphs 1 through 54, inclusive.

59. By virtue of the acts described above, including the recklessly indifferent provision of batteries unfit for their intended purpose to the DOD for use in combat circumstances and for the submission of false or fraudulent claims to the United States for payment of batteries, Defendants have knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval of the False Claims Act, as amended, at 31 U.S.C. § 3729(a)(1).

60. Because of these acts, the United States has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## FOR VIOLATION OF FALSE CLAIMS ACT
## AGAINST DEFENDANT M.K. BATTERY, INC.

61. Plaintiff realleges and incorporates by reference, as if fully set forth herein, paragraphs 1 through 57, inclusive.

62. Plaintiff was unlawfully threatened and discharged by Defendant M.K. Battery, his employer, because of lawful acts done by McIntosh on behalf of the soldiers in Iraq and the general public. Defendant M.K. Battery violated 31 U.S.C. § 3730(h) when it retaliated against Plaintiff for exercising his rights under the False Claims Act.

## FOURTH CAUSE OF ACTION
## FOR VIOLATION OF MINN. STAT. § 181.932

63. Plaintiff realleges and incorporates by reference, as if fully set forth herein, paragraphs 1 through 59, inclusive.

64. Plaintiff was unlawfully disciplined, threatened and discharged because, acting in good faith, he reported a violation or suspected violation of federal law to his employer and/or refused his employer's order to perform an action that Plaintiff had an objective basis in fact to believe violated federal and/or state law, and/or rules or regulations adopted pursuant to law, and informed his employer that the order was being refused for that reason.

65. Defendant's unlawful discipline, threats, and termination was a violation of Minn. Stat. § 181.932, subd. 1(a), and was taken knowingly, maliciously, and with reckless disregard of Plaintiff's rights.

## V. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that judgment be entered as follows:

A. For the First Cause of Action, for treble damages and civil penalties up to the maximum permitted by law and that judgment be entered jointly and severally against all Defendants;

B. For the Second Cause of Action, for treble damages and civil penalties up to the maximum amount permitted by law and that judgment be entered jointly and severally against all Defendants;

C. For the Third Cause of Action against M.K. Battery, reinstatement, two times the amount of back pay, interest thereon and other damages sustained as a result of this discrimination necessary to make Plaintiff whole;

D. For the Fourth Cause of Action against M.K. Battery, for back pay, front pay, mental anguish and suffering and punitive damages;

E. For the maximum relator's share allowed pursuant to 31 U.S.C. § 3730(d);

  F. For attorneys' fees, costs and reasonable expenses incurred in the prosecution of this action; and

  G. For any and all other relief to which Plaintiff may be entitled.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE JURY IS AVAILABLE.**

Dated this 6th day of February 2013  HALUNEN & ASSOCIATES

*/s/ Susan M. Coler*
Clayton D. Halunen, Atty. No.: 219721
Susan M. Coler, Atty. No. 217621
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: 612-605-4098
Facsimile: 612-605-4099

**ATTORNEYS FOR PLAINTIFF**



Minneapolis Office:
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
www.halunenlaw.com

Chicago Office:
415 North LaSalle Street
Suite 502
Chicago, IL 60654
Telephone: (312) 222-0660
Facsimile: (312) 222-1656
www.halunenlaw.com

February 6, 2013

**VIA PERSONAL DELIVERY**

Clerk of Court
United States District Court
District of Minnesota
U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Re:   *U.S. ex rel. McIntosh v. M.K. Battery, Inc., et al.*
       **Court File No.: Civ. 08-SC-6471 DWF/JJK**

Dear Clerk of Court:

Enclosed for filing under seal please find the original *Amended Complaint for Violation of False Claims Act Jury Trial Demand* with regard to the above-referenced matter. Also enclosed is a courtesy copy. Please stamp the copy "Filed" for return to our office.

Thank you for your assistance and cooperation.

Sincerely,

HALUNEN & ASSOCIATES

Cecilia Mazique
Paralegal

/cam

Enclosures